## ULMAN et al. v. CLARK et al.

### (Circuit Court, D. West Virginia. March 31, 1900.)

1. NEW TRIAL—VERDICT—SUFFICIENCY OF EVIDENCE.

   Where the evidence is conflicting, it is the duty of the court on a motion for a new trial to weigh the facts, and set aside the verdict if it is against the weight of the evidence.

2. BOUNDARIES—CONFLICTING CALLS—RELATIVE IMPORTANCE.

   In locating boundaries, resort will be had first to natural boundaries, next to artificial marks, then to adjacent boundaries, and last to courses and distances; but, if it appear that a mistake has been made, an inferior means of location will control a higher one.

3. SAME—LOCATION OF CORNERS.

   A boundary was described as running down a stream to certain trees at its mouth, but the mouth of the stream was not called for as a corner. The line, run according to the calls for courses and distances, did not follow the stream, but ran to trees marked to correspond with the calls. *Held* that, in determining the location of the corner, the call for the mouth of the stream should be disregarded.

4. SAME—LOCATION OF LINES.

   If the call for a line to follow a stream does not call for its meanders, and the call for the stream conflicts with the call by courses and distances, the call for the magnetic line will control.

5. SAME—MARKED OBJECTS—DESCRIPTION.

   Marked trees which indicate the fixed boundaries of land held by coterminous owners will not be departed from, though such boundaries, in their descriptive character, do not agree with the marked objects called for in the survey.

6. SAME—LOCATION OF CORNER—CONFLICTING CALLS.

   A survey described the fifth line as running down a stream, thereby fixing the end of the fourth line at its intersection with the stream, and greatly reducing the length of the fourth line as described by course and distance. The survey also called for the fourth line to terminate at marked objects, which were found at a point closely corresponding with the course and distance calls. *Held* that, in fixing the corner at the end of the fourth line, the calls for the stream should be disregarded.

7. SAME—SUFFICIENCY OF EVIDENCE.

   An ancient survey described the fifth line by course and distance, and also called for it to follow a stream to its mouth, to a corner indicated by marked trees. To follow the stream, the line would be shorter than the call for distance, at right angles with the described course, and the tract would include but one-half the amount of land described. By running the lines by courses and distance, disregarding the calls for the stream, it would correspond with a plat of the ancient survey, and include the amount of land described. Marked trees were found one-eighth of a mile from the mouth of the stream, but there was no evidence that they were marked for the ancient survey, or were not marks on some other survey. Trees properly marked were found near the corner as indicated by the course and distance calls, and the sixth line running from these trees was found marked for some distance. From the plat of the ancient survey, it was apparent that the surveyor was mistaken as to location and course of the stream. *Held*, that the corner on the line as described by course and distance, and not the corner on the stream, was the true corner.

8. SAME—ADJOINING SURVEY—PRIORITY OF SURVEY.

   If the lines of an elder survey can be established by its lines and corners, and the lines and corners conflict with an adjoining survey, the lines of the adjoining survey must give way to the lines of the elder survey.

**9.** SAME—ACQUIESCENCE IN BOUNDARY.

> If an owner, who is ignorant of the true boundaries of his land, by mistake acquiesces in a line as a boundary, he and his grantees are not thereby precluded from afterwards claiming to the true boundary.

In Ejectment.

The following are the maps referred to in the opinion:

TAYLORS ORIGINAL MAP.

TRIAL MAP.

NOTE LINE A,B,BB,C,V,R,Q,P,O,X,Co, AND A. CLAIMED BY DEFENDANTS
———————— LINE CLAIMED BY PLAINTIFF—"PURPLE LINE" OF OPINION.
———————— VERDICT LINE.

Okey Johnson, Flournoy, Price & Smith, and Mollohan & McClintic, for plaintiffs.

Brown, Jackson & Knight, E. W. Clark, Jr., and A. W. Reynolds, for defendants.

JACKSON, District Judge. This cause having been tried at a former term of this court before a jury, a verdict was returned for the plaintiffs, finding for them a certain portion of the 150,000 acres of land, which is supposed to be about one-half of the amount demanded in the declaration of the plaintiffs. Upon the return of the verdict, and before any judgment was entered thereon, a motion for a new trial was made by the plaintiffs, and to set aside the verdict, upon two grounds:

"(1) Pecarse the finding of the jury in locating the fifth line of the survey from D to R, as laid down on the trial map, and not from D to E, was contrary to the law and evidence, and contrary to the court's instructions. (2) Because the court erred in admitting the reports of Surveyors Lybrook and Vawter."

The first reason assigned for setting aside the verdict involves two questions: (a) Whether the finding of the jury was contrary to the law as given to them in the instructions of the court; (b) whether the verdict of the jury was contrary to the weight of the evidence.

I will consider first the ground assigned in support of the motion, that the verdict was contrary to the evidence. It is a well-settled principle of law that, where a jury returns a verdict that is clearly against the weight of the evidence, it is the duty of the court to set the verdict aside and award a new trial. It is equally well settled that the verdict will not be set aside, as being contrary to the evidence, where there is a slight preponderance of evidence against the verdict. When the conclusions of a jury are founded on insufficient evidence, or contrary to the instructions of the court, or arrived at by compromise or lot, these are always grounds for setting aside the verdict. These are well-settled principles of law, and it is not necessary to cite authorities to sustain this position. Upon a motion for a new trial the court is to weigh the evidence, where it is conflicting, and if, in its judgment, it is manifest that the weight of the evidence is against the verdict as returned by the jury, its plain duty is to set it aside. While it is conceded that it is the province of the jury to find the facts, it is nevertheless the duty of the trial judge to see that the action of the jury is intelligent and just in the exercise of this function. This is a judicial discretion with which every court is invested, and which gives the trial judge a salutary supervision over the verdict of a jury; but it is a discretion which should not be abused, and should only be exercised to further the ends of justice. Adopting the principles of law as announced, for my guide, I will proceed to discuss the evidence, which is somewhat conflicting, upon the vital question of the location of the survey upon which the jury returned its verdict.

It is to be observed that the survey made in this case bears date in 1794, and the grant was issued upon it the 20th of March, 1795. The survey was made when the country in which the land lies was a dense wilderness, and at a time when it was not actually inhabited either by the white men or Indians, but when it was subjected to the incursions and depredations of the Indians who occupied, and had nearly the supreme control of, the country adjacent to the lands involved in this controversy. This is not only an historical fact, but there is evidence in this cause tending to show that such was the condition of the country at the time Taylor made his original survey filed in this case. I allude to this merely to show the difficulties which surrounded the surveyor when he made this survey. There is evidence in this cause of a tradition that existed in this country that tends to show that while Taylor, the surveyor, was surveying the lands in controversy, he was unable to complete his survey for the reason that he was driven off by the Indians when he was running the sixth line of the survey.

The beginning corner of this survey, as well as the second, third, and fourth corners, are conceded to be located where the plaintiffs claim them. On the trial map in this cause the beginning corner is at A, the next corner at B, the next at B, B, and the next at C. There is no dispute as to these corners. The first contention that arises as to the location of this survey is as to the true location of the fifth corner. It is claimed by the plaintiffs to be at D on the trial map, while the defendants claim it to be at V. The jury, in their verdict, found that the fourth line of the survey, which calls to run N., 10° E., 2,960 poles, crossing the North Fork of Tug river, the dividing ridge between the same and the Elkhorn Fork of Tug river, and the said fork to three white oaks and a poplar in a bottom on the northeast side of the same, terminated at the point D, and fixed that point as the fifth corner of the survey. This finding of the jury establishes the fact that the corner claimed by the plaintiffs called for in the fourth line of the survey is located at D on the trial map. The fifth line of the survey calls for "running N., 10° W., 880 poles, running down Elkhorn Fork to the mouth of the North Fork to a poplar and maple at the same, corner to a survey of five hundred thousand acres of Wilson C. Nicholas, and with lines thereof." This line is claimed by the plaintiffs to run from the point D, where the three white oaks and poplar are called for by Surveyor Taylor at the end of the fourth line of his survey, to the point E, where a poplar and maple are called for by Taylor in his survey. It is claimed by the plaintiffs that the jury disregarded this call of Surveyor Taylor, and instead of running the course and distance called for, beginning at the point D, as designated on the trial map, and running to the point E, they made and adopted an arbitrary line from the point D to R, on the map, which does not correspond with either the course or distance as called for in the fifth line of the survey, and that, instead of locating the sixth corner at the point E, the jury located it at the point R, where, also, it is claimed a maple and poplar stood. If the contention of the plaintiffs is true, that the end of the fifth line is at the point E, and not at the point R, then the theory of the defense fails. The motion for a new trial greatly depends upon the true location of the fifth line of Taylor's survey. What then is the true line? Is it the line D, E, or is it the line D, R? The answer to this question involves an examina- tion and analysis of the evidence in this case. I will first take up the evidence of the plaintiffs, which tends to establish that the fifth line of Taylor's survey, as originally made and laid down, is correctly represented by the line D, E, as shown on the surveyor's map in this case, and not by the line D, R; and afterwards I will take up the evidence of the defendants, which tends to show that the fifth line should be run from D to R, and compare the evidence to determine whether the verdict of the jury, as returned in this cause, is sustained by the weight of evidence, or whether the weight of evidence is against the verdict of the jury. This is a vital question. But, before I proceed to discuss the weight of the evidence, I will briefly consider the rule of law sanctioned by the courts in ascertaining and locating the boundaries of land.

In locating lands the general rules are: Resort is first had to natural boundaries, next to artificial marks, then to adjacent bounda-

ries, and last to course and distance. To these rules, however, there are exceptions, so that neither rule is inflexible; but, when it is apparent that a mistake has been made, an inferior means of location may control a higher one. Fulwood v. Graham, 1 Rich. Law, 491. In the case we have before us there are no corners called for, as distinguished from marked corners, unless it is in the fifth line of the survey, which calls to run down Elkhorn to the mouth of the North Fork, to a maple and poplar. But it is to be observed that the call for "running down Elkhorn Fork to the mouth of the North Fork, to a maple and poplar," is not a call for the North Fork as a corner, but it is a call for a poplar and maple as a corner,—not at the mouth of the North Fork, but to be found by the course and distance called for by running down the Elkhorn Fork. The poplar and maple is the corner called for, and, if found and marked as a corner to correspond with the survey, must be adopted as the corner, wherever found; and if, by following the course and distance called for, the line runs elsewhere than to the mouth of the North Fork as it exists to-day, then the line of the survey should be made from D to E, as called for in the fifth line of the survey, if the corner is found at that point, and so much of the call as calls for the mouth of the North Fork would be regarded as descriptive of the location where the other corner trees stood, and the jury in its finding should have disregarded the call for the mouth of the North Fork, as a mistake of Surveyor Taylor in his description, and as being inconsistent with the call for the corner of the maple and poplar, if found at the point E; and, under a well-known and familiar rule, that which is most certain and most reliable to locate the corner of the survey must be adopted, and that which is less certain must be rejected. But it is claimed that a maple and poplar were found at R, at the point now called the mouth of the North Fork, and the defendants offer a large amount of evidence to sustain that claim. This claim I will consider when I come to discuss more particularly the evidence of the defendants. In this survey no streams are called for, as boundaries of the land, but many streams are crossed by the various lines of the survey. The running down a stream to a point called for does not establish the fact that the stream was a boundary line; for, while the line of a survey may run down a stream, if it does not call to follow its meanders the line of the survey will be controlled by the magnetic line called for. The calls in the survey of the 150,000 acres are more or less descriptive calls, but the terminal points called for are all for marked objects. Marked trees which indicate the fixed boundaries of land held by coterminous owners should not be departed from, though such boundaries in their descriptive character do not agree with the marked objects called for. A marked tree called for in a survey, and found to bear the date of that survey, and properly marked for a line of it, becomes, from the time that it was marked as a corner, a natural object, which, if found, controls the course and distance; and, if it becomes necessary to reach it as a corner, both course and distance should be changed, to reach the object called for in the survey or grant.

In the fifth call of the Patterson survey, Taylor calls for running down Elkhorn Fork to the mouth of the North Fork, to a poplar and

maple. This, it is claimed by the defendants, fixes the end of the fourth line at the point where it crosses what is now known as the "South Fork of Elkhorn," as laid down upon the surveyor's map filed in this cause, and that it should stop there. The first answer the plaintiffs make to this position is that the line does not cross the main Elkhorn Fork, as now ascertained by the surveyors, but crosses a branch called the "South Fork." Their second answer is that to adopt that point as the end of the fourth line, running from C, would greatly reduce the length of the line. Their third answer to this position is that the corner called for at the end of the fourth line is three white oaks and a poplar, which was established by the jury as being at the point D, and which closely corresponded with both the course and distance called for in the original survey of Taylor; and, if they were satisfied from the evidence that the three white oaks and poplar stood there, there was no escape from that conclusion. I agree with the finding of the jury, and think there can be no question that its conclusion was correct, and that the end of the fourth line was at D, and not at or near the point B on the trial map.

The next line of Taylor's survey calls for N., 10° W., 880 poles, running down Elkhorn Fork to the mouth of the North Fork, to a poplar and maple. The plaintiffs claim that this line on the trial map runs from D to E, while the jury finds the line to run from D to R. The plaintiffs say that the establishing of the line from D to R is against the weight of the evidence, being a clear departure from the true lines of the survey, as called for in Taylor's original survey, and which is laid down upon his original survey as running from D to E. This is a vital question, and involves a discussion of the evidence, to determine whether the weight of the evidence is against the verdict of the jury in fixing the corner at the end of the fifth line of the survey at R, instead of E. Upon this question I will first look at and consider the copy of the original plat made by Taylor, and ascertain from it, if I can, where he located the line on his map, and try to follow his footsteps.

The plat of Taylor discloses the fact that the fifth line of the survey, as laid down upon it, runs from D to E, as laid down upon Cole's map. This line, as run by the surveyor in this cause, conforms nearly in both course and distance to the line of Taylor, which he made as the fifth line of his survey over 100 years ago. In fact, the exterior lines of the 150,000 acres, as run by the courses and distances called for in Taylor's survey, and laid down on the trial map, prove a most striking resemblance between Taylor's plat, filed in the land office September 18, 1794, and the survey as laid down on the trial map. Taylor's survey has 11 lines. Cole's plat shows 11 lines run by the courses and distances as called for in the original survey. The land embraced in the survey is about the same. It is a most significant fact that the shape and form of Taylor's survey is so accurate that his tracks, after the lapse of a period of 100 years, could be followed by the surveyor in this cause. I am unable to perceive any reason that can be or has been assigned in support of a verdict that makes an entirely new plat for Taylor. It cannot be said that the line that the jury made from D to R corresponds with the call of the patent, for

it does not respond to the course and distance called for. As the jury found the line, there is not the slightest resemblance to Taylor's plat to support its finding. Taylor's line from D to E calls N., 10° W., 880 poles. The line adopted by the jury runs almost at right angles with the call of Taylor, and is only about one-half of the length of the line called for. If I rest the discussion at this point, it must be apparent that the jury disregarded the plain facts which Taylor's plat shows, and which throw a flood of light upon this question; for it appears to me that it cannot for a moment be contended and sustained from the calls of Taylor's survey, or from the form of his plat, which embraces 150,000 acres of land, that Taylor ever intended that the fifth line of the survey should run from D to R, and, I will add, or from the point where it crosses the South Fork of Elkhorn, supposed to be represented by B on the trial map. I conclude that from Taylor's map there is no evidence to sustain the line from D to R, for the reason that such a line in no way harmonizes with the line called for in the survey, nor with its shape, and for the further reason that the boundaries of the survey as found by the jury would contain an area of less than one-half of the number of acres called for in the grant. But it is claimed by the defendants that there is sufficient evidence to sustain the jury in its finding that R is the corner called for at the end of the fifth line, and not E, and that course and distance must give way to this corner at R.

I will now examine the evidence, independent of Taylor's map, and try to determine whether the corner called for at the end of the fifth line is at E or R. It is to be observed that the entry, survey, and patent all call for a maple and poplar at the end of the fifth line. If I adopt the course and distance as called for in Taylor's survey, the magnetic line runs to the point E, but not to R. As I have before said, this is a vital question, and it becomes necessary to analyze the evidence offered, to determine which of the two corners—the one at E or the one at R—is the corner called for by Taylor, and tends best to execute the design of the surveyor when he made the plat, in 1794. The corner at E is reached by course and distance, but the corner at R is in conflict with both course and distance, and in fact rejects both. But it is claimed by the defendants that the fifth line calls to run down Elkhorn Fork to the mouth of the North Fork. The call, "running down Elkhorn Fork to the mouth of the North Fork," is descriptive, and not locative; and, though Taylor calls for "running down Elkhorn Fork to the mouth of the North Fork," yet, if by an actual survey the corner called for at the end of the fifth line is found, being a locative call, though it conflicts with the descriptive call to run down Elkhorn Fork to the mouth of the North Fork, it follows that the line must be run without regard to the descriptive call, so as to reach the corner found as called for, and the descriptive call should be disregarded. It is certainly reasonable to suppose that the topography or face of the country, in regard to the course of streams, would materially change in a period of 100 years. There is some evidence in this case tending to show that the courses of the streams have changed very much since Taylor made his survey. There is, however, a most striking resemblance (with one exception)

between the location of the streams on Taylor's map and on the surveyor's plat in this case. And this is a potential fact in support of the contention that Taylor, though the country was infested with Indians, was upon the ground, and actually ran five lines of this survey, and made the corner called for in his survey. Not only is this so, but there is strong evidence tending to show that he ran a portion of the sixth line, which he did not finish for the reason that there is some tradition that he was driven off by the Indians. What, then, is called for at the end of the fifth line? I answer, a maple and poplar. Were the maple and poplar found? Were they found at the mouth of the North Fork? They were, as laid down on Taylor's original map. An examination of that map shows conclusively where he laid down Elkhorn, and where the mouth of the North Fork was when he made the survey. It seems, after the lapse of 100 years, that the creeks, as now found, do not conform to the places where Taylor laid them down on his plat. Is it remarkable that, in passing through a country which was a dense wilderness, he might have made a mistake in a descriptive call? But he made no mistake as to the corner, and marked it; for it is found where he said it was, which seems to have been marked to correspond with the age of the survey, for the marks had the appearance of being very old, as the bark from the maple tree showed when it was produced in court. Eleven witnesses testified to having seen the maple called for at the point E. Frazier testifies that when he was running with Lybrook, in 1849 or 1850, an old man by the name of Garrett Lambert showed him the maple as an old corner, and that there was (and his memory is that there was) a poplar within a radius of 10 feet of it. Several witnesses have testified to having seen a poplar stump close by the maple. James H. Shannon, a witness for the defendants, testified that he ran the line N., 10° E., for Iaeger, and found the maple called for, which was marked as a corner, and at that time the maple was standing; that there was a down poplar a short distance from the maple. Owen Mitchum saw the maple tree and a poplar stump, and he says there were two sets of marks on the maple, and that he could see them; and he produced the bark from the maple in court on the trial of the cause. William G. W. Iaeger testifies that he saw the maple at E in 1887, and that there were three hacks on each side of it. On one side of the tree they corresponded with the line from D to E, and on the other they corresponded with the line from E to F; and he says there was a poplar stump there about 8 or 10 feet from the maple. Daniel H. Harman proves that he saw the maple at E, and that the tree was down, and had three hacks on the top side of it, and that they looked old, and the tree was plainly marked. He further proves that he found an anciently marked line running from the maple at E towards the point F. Preston Beavers testifies that in 1887 he was with Shannon when he was running the line, and that they ran the line from D to E, and found a dead maple at E, which was marked as a corner tree on both sides, corresponding with the calls of the survey; that the appearance of the marks was very old. He testifies, also, that he was there afterwards with Sinnett and Cole, and saw the same tree which Shannon found, and an old rotten stump, and that

they found some marked trees on the line from E to F. W. H. Kelley saw the maple after it had fallen, and testifies that there were three marks on the southeast side, facing the line running from D, and that he saw a stump and a piece of poplar near by the maple, and that the maple was an old marked tree. Edward J. Sizemore proves that he saw the maple in 1849 or 1850, and that there was a small poplar about 25 or 30 feet from the maple that was marked; that the maple was shown to him as a corner by Garrett Lambert, an old man who lived in that neighborhood. C. D. Frazier testifies that he saw the maple in 1849 or 1850, and it was shown to him by Garrett Lambert; that it was an old marked tree; and that a poplar, he thinks, stood within a radius of 10 feet from it. William E. Sinnett proves that he ran the line from D to E, and found a fallen maple and the stump of a poplar tree; that the line from D to E ran "rather sloping up the hill; rather down the creek; rather down the North Fork,—the way the water was running." A. P. Sinnett proves that he saw a maple at E, and that "it was plainly, and very old, marked as a corner tree"; that he found it as he ran the line from D to E, at a distance of 890 poles from D,—only a difference of 10 poles between his running and Taylor's. Cole, who made the survey in this case, ran the line from D to E N., 11° W., 886 poles, showing a difference of 1 degree and 6 poles between the running of Taylor's line and his line. This is substantially all the evidence of the plaintiffs to sustain the corner at E.

I will now consider the evidence offered by the defendants to support their contention that the corner called for in the fifth line of the survey stands at R, instead of at E. In this connection it is to be observed that the entry, survey, and patent of the 150,000 acres are older than the entry, survey, and patent of the 500,000 acres under which the defendants claim. While it is true the fifth call of the 150,000-acre survey calls for a poplar and maple at the same corner to a survey of 500,000 acres with Wilson C. Nicholas, and lines thereof, yet, the Patterson survey being the elder, if it can be established by its lines and corners, and those lines and corners are in conflict with any coterminous or adjoining survey, then the lines and corners of that coterminous or adjoining survey must be bounded by the lines and corners of the Patterson survey, it being the elder, and the course and distance of the coterminous survey must give way to the lines of the elder survey. This principle of law is so well settled that the court deems it unnecessary to cite authorities to sustain the position. In order to sustain the contention of the defendants that the point R on the trial map is the end of the fifth line of the Patterson survey, the weight and preponderance of the evidence submitted to the jury must support that contention. In this connection it must be borne in mind that both the 480,000 and the 500,000-acre tracts have been subjected to a great deal of litigation, which resulted in surveys having been made at various times to ascertain those lines. A man by the name of Hector claimed one of those tracts a great many years ago, and had the lines run with a view to finding the corners of the 500,000-acre tract. It is apparent from the evidence that very little, if any, effort was made to find out the true boundaries of the 150,000 acres; but the surveyors appear to have assumed, in running

the 500,000-acre tract, that they were necessarily the lines and corners of the 150,000-acre tract. Nor does it appear that in the early running of these surveys, the surveyors went to the beginning point of the 150,000 acres, and ran its lines as far as the point E on the trial map. It was not until the plaintiffs had acquired these lands that there was a studious and continuous effort to find out the true boundaries of the 150,000 acres. If, in the early running of these surveys, there had been an effort to commence at the beginning corner of the 150,000 acres, and locate that survey, and then locate the 500,000 acres binding upon it, possibly it might have saved the confusion that now exists in regard to those lines. It is evident to my mind that a great deal of confusion existed in the region of country in which the lands lie, by reason of the fact that there was no effort to run out this connection of surveys when Lybrook ran the 500,000 acres off in 1828. There is some testimony in this case that tends to show that the corner claimed by the defendants at R was called by some of the old people in that country the "Hector Corner," and by others the "Wilson Cary Nicholas Corner." I mention these facts to show that the old people of that country never referred to this corner as a corner of the 150,000 acres, except Kiah Harmon, who told Daniel Harmon that it was a corner of the 150,000 acres and the 500,000 acres, but who also told Joseph Lambert that it was a corner of the Hector survey. This tends to explain the confusion that exists in reference to this corner. But I will hereafter discuss the evidence relating to this matter.

Lybrook seems to have been the earliest surveyor who ran the 500,000 acres, running what he supposed to be the boundaries of the 500,000 acres, but he did not at that time commence at the beginning corner of the 150,000 acres; for he was running the 500,000 acres, at which time Hector was with him. He stated that he found a maple and poplar, anciently marked as a corner, in a small bottom on the northwest side of the fork, and about 35 or 40 poles from the junction of the two forks. He does not state whether the trees were blocked to show that the age of the marking corresponded with the date of the survey. He does not state whether the marks upon the trees corresponded with the lines called for in the Patterson survey. Andrew G. Milam testifies that he saw a marked maple and poplar at the point R when he was about 8 years old; that he showed them to James Hector. But he does not know what they were marked for, nor does he state whether they were anciently marked at that time. Daniel Harmon says he saw a marked poplar at R in 1843; that, at the time he saw the poplar, Kiah Harmon, an old surveyor, and James Hector were there, and that Kiah Harmon stated that it was the corner of the 150,000 acres and the 500,000 acres; but he does not state how he knew the fact that it was the corner of the 150,000 acres. There is nothing in his evidence tending to show that he was familiar with the lines of the 150,000-acre survey, or that he knew that that was a common corner of the 150,000 and the 500,000 acres. His statement does not show that he ever ran the lines by the calls and courses of the 150,000 acres. He does not say that these trees were marked to correspond with any line called for in the 150,000 acres. He does not

state anything in reference to the age of the trees. The only fact that he does state is that he saw a marked poplar at the point R on the trial map, and he said it was a corner of the 150,000 acres. Abner Lester testifies that he saw a marked maple and poplar at the point R; that "the old people said it was a corner of a big survey." But of what "big survey" he did not state,—whether it was the 150,000 acres, or the 500,000 acres, or the 480,000 acres. He states nothing about the appearance of the marked maple and poplar, or whether they were anciently marked trees, or whether they corresponded with any line called for in the 150,000 acres. David Bell testifies that he saw a marked maple and poplar at R, but that is all. His testimony does not prove that it was a corner of any survey. Joseph Lambert testifies that when Cole made the survey he pointed out where the marked maple and poplar at R stood, and that Kiah Harmon stated that these trees were a corner of the Hector survey. There is no evidence in this case that discloses the fact that Hector had anything to do with the 150,000 acres. The survey he was interested in was the 500,000 acres. E. J. Sizemore says he saw the marked maple and poplar at R, and it was called a corner of the Wilson Cary Nicholas survey, but he does not speak of it as a corner of the Patterson survey. Samuel Bell testifies that the trees at R were pointed out to him as old corner trees, but does not speak of the survey they were a corner of. Surveyor Vawter says he made a survey of the 500,000 acres in October and November, 1856, and states that he ran to the poplar claimed to be a corner at R on the trial map, and "it was plainly marked as a corner, and old, to suit the calls of the Patterson survey." He does not state that he ever ran any of the lines of the 150,000 acres, he does not state he was on the line that ran from D to E, he does not state the course and call of the Patterson survey, but merely states that it was marked to suit the calls of the Patterson survey. How he could state this as a fact, without having been upon the lines of the Patterson survey, and especially upon the line running from D to E, I am unable to conjecture. Jane Milam says that she was present when Vawter was making his survey, and that he ran to the point R, and that Maitland claimed that tree as his corner. William Taylor says that he was with Vawter when he made the survey in 1856, and saw the marked poplar at R. Cole's report says that there was a large stump at R, which was pointed out to him by Owen J. Sizemore, Joseph W. Lambert, Andrew Milam, Jane Milam, and William Taylor as the corner of the Maitland-Nicholas 500,000-acre survey. Here, again, nothing is said about the Patterson survey.

In analyzing the evidence offered by the defendants to which I have just referred, it is to be observed that the fifth call of the 150,000-acre survey speaks of running down to the mouth of the North Fork, to a poplar and maple. Not a single witness introduced by the defendants testified that the poplar and maple they speak of were found at the mouth of the North Fork. In Lybrook's report of a survey of the 500,000 acres, he states, "by running N., 80° E., 1,060 poles, that near the mouth of the North Fork he found a poplar and maple, anciently marked as a corner, in a small bottom thirty-five or forty poles from the junction of the two forks"; but he says "the marks did not com-

pletely show the course going for the same, but seemed to answer for Patterson survey." He does not speak with any confidence as to the corner, and in fact does not state whether it is a corner of the Patterson survey. Vawter shows this same corner on the north-west side of the North Fork of Elkhorn, about 35 or 40 poles from the junction of the two forks. This is evidently the same poplar that Lybrook speaks of, because they both agree that this poplar is about 35 or 40 poles from the junction of the two forks. The call of the survey is "down Elkhorn Fork to the mouth of the North Fork," and not for a corner on the northwest side of the North Fork of Elkhorn. No poplar and maple are found at the mouth of the North Fork as it now exists, but, if any are found at all, they are 35 or 40 poles away, which is about one-eighth of a mile from the point called for. .

In connection with the foregoing testimony, it is claimed that the persons from whom the plaintiffs derive their title, as appears from the deed of Chitty, and Britton's report or map made for Thompson, Iaeger's vendor, have heretofore recognized the corner at R as a corner of the survey of 150,000 acres. I do not regard this as a controlling fact. It only tends to show that in the wilderness of that country, and the confusion that exists among these old lines, the owners of these lands are often mistaken as to the true location and extent of their boundaries. That fact does not prevent the present owners of the land from setting up the true boundaries of their survey, and their rightful claim to the lands embraced by them. Mistakes of this character have often occurred, and the courts have held that where a man has been ignorant, in the first instance, of the true boundaries of his land, and has recognized a boundary that afterwards he found he was mistaken in, that fact does not debar or prevent the assertion of his rights to the land embraced, to the full extent of his boundaries.

It will be observed that I have discussed and considered the evidence offered by both plaintiffs and defendants as to the vital point in this case,—whether the corner at E or the corner at R is the correct corner of the survey,—and upon which this motion for a new trial mainly depends. Considering the weight and preponderance of this evidence in support of the verdict of the jury, it is apparent to my mind that there is no evidence offered by the defendants here which tends to overthrow the fact that the original map of Taylor is in conflict with the position taken by the jury as to the corner at D. Following the lines of Taylor's survey, you cannot by course and distance reach the point R. There are marks upon the corner tree claimed to be at R, but there is no satisfactory proof to show that these marks correspond with the course and distance called for in the fifth line of the Patterson survey. In fact, only one witness states that they appear to be marked for the lines of the Patterson survey. This is a remarkable fact.. Taylor seems to have marked, as far as he ran, the corners called for at the end of the course and distance of each line of his survey. The jury has established the fact by its verdict that D is a corner of the survey, and it is inconsistent with this finding to find that R is the next corner of the survey. As we have seen, the fifth call of the Patterson survey is N., 10° W., 880

poles. This is in the direction of the point E, and is not in the direction of the point R. To run a line of this survey from D to R is simply to make a line of the survey not called for by Taylor, and which is inconsistent, and in no respect conforms to Taylor's plat of the survey that he filed in the land office at Richmond in 1794. This fact is not explained, nor is it overthrown, by the evidence of the defendants. On the contrary, the evidence of the defendants to support the point R merely tends to show that at or near the point R a maple and a poplar tree stood, without sufficient evidence to establish the fact that it was a corner of Taylor's survey of the 150,000 acres, independent of the statements of Vawter and Lybrook in their reports, and of the statement of Kiah Harmon, one of the witnesses for the defendants, who stated that it was a corner of the 150,000 acres and the 500,000 acres; but no reason is given for their statements, except that it was a marked corner, and apparently old. It was not blocked, nor does it clearly appear that the marks corresponded with the course and distance called for by Taylor in his survey. On the contrary, the course and distance of the line from D to E are in harmony with the original plat of Taylor filed in this cause. It is true that the corner at E had been found by some of the early surveying that was done, not upon the 150,000 acres, but upon the 500,000; but it is equally true, in the view I take of this case, that the evidence tends to establish that corner as a corner of this survey, and the fact that it was old; and that both the maple and poplar were seen by many persons, and found at or near the place called for at the end of the fifth line of the survey, is so potential, and so conclusive to my mind that it was a corner of the fifth line of this survey, that I cannot well conceive how a jury could so far depart from what must be held and deemed to be a great preponderance of evidence in its favor.

It is claimed by the defendants that a descriptive call of "running down Elkhorn Fork to the mouth of the North Fork, to a poplar and maple," is inconsistent with the location of the corner at E. But, as I have heretofore said, this descriptive call must be disregarded when a locative call can be found which must control it. In this connection it is to be observed that the descriptive call does not support the contention of the defendants, because, when you run from the point D towards the point R, even as the North Fork exists to-day, the line from D to R does not run down the North Fork, but crosses the North Fork at a point very close to the point D on the trial map; and when you reach R you do not find any maple and poplar at the mouth of the North Fork, but the poplar and maple claimed by the defendants to be the corner at the end of the fifth line are at a distance of one-eighth of a mile from it, which poplar and maple, as I have before stated, were not marked to correspond with the fifth line of the Patterson survey. This contention of the defendants that the corner is at R is not supported by the great weight of the evidence in this cause. All the evidence offered by the defendants in support of that position is of that uncertain and unreliable character that we so often encounter in establishing the lines of these old surveys which were made in the last century, when the country was a wilderness, and when it was unsafe to make surveys, by reason of the fact that the

100 F.—13

Indians infested the country through which the surveyors had to run. As to the call for "running down Elkhorn Fork to the mouth of the North Fork," it is important to ascertain, if possible, where Taylor laid down the North Fork on his map. An examination of it discloses the fact that the general direction of the line from D to E is down the Elkhorn, on Taylor's map, and that the mouth of North Fork is at or near the corner called for at the end of the fifth line as shown by Taylor's map. It is very apparent that Taylor never located Elkhorn creek and the North Fork as they now exist, and his map shows that he could not have been at the point R on the trial map, and that, in passing through the dense forest that must have existed at that day, he may possibly have made a mistake as to the true location of Elkhorn creek and the mouth of the North Fork, or, possibly, in the great length of time that has elapsed since he made that survey, the courses of these waters have changed. But, with this exception, there is a most striking resemblance between the location of the streams by Taylor on his plat of the survey at the time he made it, and as they are found to-day. But I must determine what Taylor meant by his call, "running down Elkhorn to the mouth of the North Fork." His location of the streams upon his map clearly shows that the mouth of the North Fork is at or near the point E on the trial map. His location of the Elkhorn is not only inconsistent with the theory of the defense in this case, but clearly establishes the fact that Taylor located the North Fork at or near the point E on the trial map, and located the fifth line down Elkhorn, as he understood its location. The jury, in looking at this case, must have entirely ignored this most pregnant and conclusive fact as to where the corner called for at the end of the fifth line of the survey was. The establishment of the corner at R on the trial map is not only inconsistent with the running of the lines called for in Taylor's survey, but is overthrown by the fact that there is not a single act of Taylor, as derived from his survey, which tends to support the position of the defendants that the corner of the Patterson survey was at R. It does not appear that any of the parties, in the early surveying done in that country, ever had the original plat of Taylor before them, and it is apparent to my mind that they never ran the courses and distances of the Patterson survey of 150,000 acres as Taylor laid it down. The corner at E on the trial map is not only supported by the fact that Taylor located the corner at the end of the fifth line on his map at that point, but the maple at the corner was found to be still standing at the time Shannon ran, in 1887, and at the date of the survey in this case was down, but still to be seen there. In addition to having been seen by Shannon, it was seen by Owen Mitchum, Daniel H. Harmon, Preston Beavers, William H. Kelley, Edward J. Sizemore, C. D. Frazier, William E. Sinnett, and A. P. Sinnett; and some of them also testified as to having seen the poplar, and others as to having seen a poplar stump, within a radius of 10 feet of the maple. It also appears from the evidence that Garrett Lambert, an old resident of that section of the country, pointed these trees out as a corner of an old survey. When Cole ran the line according to Taylor's course and distance, he reached this corner with only a difference from Taylor's

calls of one degree in variation and six poles in distance, which, of itself, is a most pregnant fact to sustain the location of the corner at E. From what we have said, it must be apparent to all that Taylor, on his original map, places the corner at or near the point E on the trial map; that the great weight of evidence in this case tends to support the fact that that corner was there; that the course and distance called for by Taylor, with a slight variation, reach the corner at E on the trial map. But this location is further supported by the fact that an old line running from E to F on the trial map was found marked about half the distance called for on that line, and that Harmon and Beavers saw that line in 1872, and described it as an anciently marked line running in the same direction as the line from E to F. It is true that it is an unfinished line, and it is a matter of little or no moment whether the tradition that exists in that country is correct or not,—as to why that line was abandoned by Taylor; but it corresponds generally with the course and distance called for, and is an anciently marked line, and apparently ran from the marked corner at E. This is a striking fact that exists in this case, which tends to support the location of the corner at E.

I have endeavored to analyze and discuss freely the evidence in this case. offered by both plaintiffs and defendants, and I have labored, in the discussion of it, to see if I could justify the verdict of the jury, and if it was consistent with the great weight and preponderance of evidence; but when I find that the jury established the corner at D, and that the course and distance called for by Taylor's survey take you to E, and that there is a great mass of evidence in the case that shows that a corner was found at that point and marked to correspond, not only with the line running from D, but with the line running from E to F, and that Taylor calls for a corner at what is known as the point E on the trial map, at or near the point where he located the mouth of the North Fork on his map, and that all the evidence in this case tends to show that the corner at E was never found to be the corner of any other survey, although since the commencement of this litigation a great deal of research has been made to account for the existence of that corner; that the location of the line from D to E conforms to the entry, survey, and plat of Taylor, while the location of that line from D to R in no respect harmonizes with it,—then I conclude that the great weight and preponderance of evidence in this case are against the verdict returned by the jury. I confess to great reluctance in disturbing a verdict of a jury, and, in the course of a long experience, I have rarely done it; but I have a duty to perform in regard to this motion, and, in the light of the evidence that exists in the case before me, I feel it to be a conviction of conscientious duty to set aside this verdict, for the reason that I believe the weight of evidence largely preponderates in favor of the location of the 150,000 acres as embraced by the purple line as laid down on the trial map.

In the case of Pleasants v. Fant, 22 Wall. 116, 22 L. Ed. 780, Justice Miller lays down the rule that:

"It is the duty of a court, in its relation to the jury, to protect parties from unjust verdicts arising from ignorance of the rules of law and of evidence,

from impulse of passion or prejudice, or from any other violation of lawful rights in the conduct of a trial. This is done by making plain to them the issues they are to try; by admitting only such evidence as is proper in these issues, and rejecting all else; by instructing them in the rules of law by which that evidence is to be examined and applied; and finally, when necessary, by setting aside a verdict which is unsupported by evidence or contrary to law. In the discharge of this duty, it is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor,—not whether, on all the evidence, the preponderating weight is in his favor (that is the business of the jury), but, conceding to all the evidence offered the greatest probative force which, according to the law of evidence, it is fairly entitled to, is it sufficient to justify a verdict? If it does not, then it is the duty of the court, after a verdict, to set it aside and grant a new trial."

In the case of People v. Knutte, 111 Cal. 453, 44 Pac. 166, and also People v. Lum Yit, 83 Cal. 130, 23 Pac. 228, the court held:

"While it is the exclusive province of the jury to find the facts, it is nevertheless one of the most important requirements of the trial judge to see to it that this function of the jury is intelligently and justly exercised. In this respect, while he cannot competently interfere with or control the jury in passing on the evidence, he nevertheless exercises a very salutary supervisory power over their verdict. In the exercise of that power he should always satisfy himself that the evidence as a whole is sufficient to sustain the verdict found, and if, in his sound judgment, it is not, he should unhesitatingly say so, and set the verdict aside."

If the principle of law as laid down by the supreme court of the United States, as well as by the court in California, in the cases cited, is correct, and which I understand to be the law of this state regulating motions for new trials, I cannot conscientiously avoid granting the motion for a new trial in this case.

The court having reached the conclusion to award a new trial upon the ground that the verdict is contrary to the weight of the evidence, it is unnecessary to notice the other grounds assigned for the motion. For the reasons assigned, the court is of opinion to set aside the verdict, and will grant a new trial upon the payment of the costs of the trial of the term.